IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLIE NEWTON, | CV 05-953 ST |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| JOANNE B. BARNHART<br>Commissioner of Social Security, | |
| Defendant. | |

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Kellie Newton ("Newton"), brings this action pursuant to the Social Security Act, 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Disability Insurance Benefits. For the reasons set forth below, the decision of the Commissioner should be affirmed.

## PROCEDURAL BACKGROUND

1 - FINDINGS AND RECOMMENDATION

Newton filed an application for benefits on December 26, 2002, alleging disability since January 1, 2000, due to three herniated discs and constant pain in the neck, arms, middle and lower back. Her application was denied initially and upon reconsideration. On June 15, 2004, a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated September 28, 2004, the ALJ found Newton was not entitled to benefits. On May 10, 2005, the Appeals Council denied Newton's request for review, making the ALJ's decision the final decision of the Commissioner.

Newton now seeks judicial review of the Commissioner's decision.

## FACTUAL BACKGROUND

Born in 1958, Newton was 41 years old on her alleged onset date. She completed high school and has worked as a retail sales clerk, a cashier, an in-home nursery school operator, and an in-home daycare director. The records submitted in this case accurately set forth Newton's medical and employment history as it relates to her claim for benefits. The court has carefully reviewed the records, and the parties are familiar with them. Accordingly, the details of those records will not be recounted here.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996).

The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). If it is based on proper legal standards, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520. Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

<u>Step One</u>. The Commissioner determines whether the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under step two. 20 CFR § 404.1520(b).

///

///

3 - FINDINGS AND RECOMMENDATION

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under step three.  20 CFR § 404.1520(c).

Step Three.  Because disability cannot be based solely on a severe impairment, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations, 20 CFR Part 404, Subpart P, Appendix 1.  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner proceeds to step four.  20 CFR § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner proceeds to step five.  20 CFR § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR § 404.1520(f)(1).

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id*.

## ALJ's DECISION

At step one, the ALJ found Newton had not engaged in substantial gainful activity since the alleged onset of disability on January 1, 2000.

At step two, the ALJ found Newton had the medically determinable impairment of cervical strain, but that this impairment was not severe as of the alleged onset date of January 1, 2000, or by the date last insured of March 31, 2002. As a result, the ALJ found Newton not disabled within the meaning of the Act.

## DISCUSSION

Newton contends that the ALJ erred at step two by: (1) rejecting the opinion of her treating physician; (2) finding her not fully credible; and (3) failing properly to consider lay witness testimony. Because the first ground is dispositive, the court need not fully address the second and third grounds.

**I. Step Two Legal Standards**

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes

necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individuals ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28).

Newton has the burden of showing disability prior to the expiration of her insured status on March 31, 2002. *Tidwell v. Apfel,* 161 F3d 599, 601 (9th Cir 1999); *Flaten v. Sec. of Health and Human Servs.,* 44 F3d 1453, 1458 (9th Cir 1995) (claimants who apply for benefits for a current disability after the expiration of their insured status must prove that the current disability has existed continuously since a date on or before the date that their insurance coverage lapsed). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

## II. Opinion of the Treating Physician

Newton argues that the ALJ erred by rejecting the following opinion in an April 18, 2003 letter from her treating physician, Sue A. Lewis, M.D., that she is unable to work due to chronic neck and back pain:

///

///

///

> She was seen in my clinic on April 16, 2003. She asked me to write a letter in support of her request to consider her disabled. This patient has a history of chronic neck and back pain which cause her to have episodes of extreme pain - she cannot sick [*sic*] for very long, she is unable to stand for any length of time. She has episodes of extreme depression related to her pain. She is unable to do much in the way of housework because of her chronic pain. She has had several injuries to her neck and back which have resulted in a 10-year history of chronic neck and back pain. She has tried various modes of therapy including chiropractic care, physical therapy. We have done MRIs to try to determine the cause of her pain and unfortunately, no treatment or diagnostic modality has been particularly useful.
>
> Examination reveals multiple areas of tenderness in her upper, mid and lower back. I am beginning to think that she could have fibromyalgia, most likely related to her back injuries. At this point, I do not believe that she is able to work. She has tried, without success, to improve her pain level, unfortunately, she has been unable to sustain much in the way of activity levels because of her pain. This has affected her ability to concentrate and is also affecting her ability to function in her home setting, interact with her children and husband. It is also causing her to be unable to hold a job because she is unable to sit, stand, walk or perform any lifting at all.

Tr. 182.[1]

The ALJ noted that Newton's treatment with Dr. Lewis began in February 2000 (after the alleged onset date) "with neck pain and headaches mentioned in the records through 2001 and brought up again in April 2003." Tr. 21. The ALJ concluded that Dr. Lewis's April 18, 2003 letter, as well as a Physical Residual Function Capacity Report ("PRFC") which she signed on May 25, 2004, "have no bearing on the issue of disability" for the following reasons:

> The physician bases disability in May 2004 on degenerative disc disease which, as shown, either did not exist or did not cause any problems until mid 2003, and fibromyalgia, which has never been diagnosed. Oddly, while citing pain related extreme depression in the letter, in completing the form she states clearly she would not recommend psychological evaluation. While citing an onset of January 1, 2000, evidently before

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

7 - FINDINGS AND RECOMMENDATION

>treating the claimant, the record shows variability in symptoms. No reason is given for supporting disability allegations of pain for which no objective basis can be found. No measurable basis for the limitations given is cited, and the doctor does not mention the improvement from the vertebrogenic surgery.

*Id.*

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Holohan v. Massanari,* 246 F3d 1195, 1202 (9th Cir 2001); 20 CFR § 404.1527(d)(2). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Id* at 1202, citing *Reddick v. Chater,* 157 F3d 715, 725 (9th Cir 1998). If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR 404.1527. *Id*, citing SSR 96-2p.

Newton argues that the ALJ first erred by asserting that Dr. Lewis based her opinion in her April 18, 2003 letter on degenerative disk disease and fibromyalgia, instead of neck and back injuries. However, the ALJ cited both Dr. Lewis's April 2003 letter and May 2004 PRFC. Although the April 2003 letter does not refer to degenerative disk disease and only refers to the possibility of fibromyalgia, the ALJ correctly noted that the May 2004 PRFC expressly includes a "diagnosis" of "neck-degenerative disk disease/fibromyalgia." Tr. 402-03.

Newton also contests the ALJ's conclusion that the degenerative disk disease "either did not exist or did not cause any problems until mid 2003" (Tr. 21), which is after Newton's last insured dated of March 31, 2002. The record contains no diagnosis of degenerative disc disease

8 - FINDINGS AND RECOMMENDATION

until the May 2004 PRFC by Dr. Lewis.  Even Newton alleged a disability as of January 1, 2000, due to three herniated discs and constant pain in the neck, arms, middle and lower back, and not due to degenerative disc disease.  Tr. 17, 74, 82.

Despite the absence of a diagnosis of degenerative disc disease prior to May 2004, Newton contends that there is no proof in the record that she did not suffer from that physical impairment during the relevant time period.  She argues that it is reasonable to infer from a longitudinal view of the medical records that the disc protrusion diagnosed in December 2003 began years earlier as the cause of her neck and back pain and became worse over time.  Such an inference is not supported by the medical records.

Although Newton has suffered neck and back pain since an automobile accident in 1992, the cause of that pain has been elusive.   Prior to March 31, 2002, Newton had several MRIs, none of which indicated a degenerative disc disease.  An MRI on February 27, 1992, was normal, except for revealing a "mild posterior disc bulge" at C6-C7 with "[n]o evidence of spinal stenosis or direct neural impingement."  Tr. 327.  Over a year later on April 29, 1993, an MRI showed "[m]iminal posterior disk bulges at C5-C6 and C6-C7 of doubtful significance" and "[n]o unusual findings."  Tr. 309.  The MRI on May 3, 1993 was "unchanged."  Tr. 306.  Another MRI in July 1994 similarly states:  "Mild central bulging discs are seen at C5-6 and C6-7 " with no evidence of any herniated discs.  Tr. 276.  The next MRI was not until September 20, 2000, after Newton's alleged onset date, yet it, too, revealed "no significant disc bulges or localized protrusions" and was "normal" except for "[p]ositional changes consistent with muscle spasm."  Tr. 173.  The ALJ correctly described this MRI as follows:

> The findings of an MRI on September 20, 2000, indicate claimant's normal cervical lordosis is straightened which may reflect an element

9 - FINDINGS AND RECOMMENDATION

>of muscle spasm, but the vertebral bodies are normal in stature; the disc interspaces are nicely preserved with good maintenance of disc height and signal character; and there are no significant disc bulges or localized protrusions [citation omitted]. The report continues in the same way, with the central canal and foramina of normal dimension; the craniocervical relationships are nicely preserved; the cervical cord is normal in caliber and signal character; and the paracervical soft tissue are unremarkable as shown. The impression is of positional changes consistent with muscle spasm, but otherwise, a normal examination.

Tr. 19.

On September 27, 2000, Dr. Lewis discussed these MRI results with Newton, noting that the "MRI of her neck revealed some cervical lordosis which reflected muscle spasm. The vertebral bodies were normal and her discs seemed to be relatively normal." Tr. 172. She also noted that Newton had brought in "some old MRI [presumably from September 2000] which showed some insignificant disc bulges in a few of her cervical discs." *Id*. Dr. Lewis had no "answers" for the cause of Newton's pain, stating: "This has been an ongoing, chronic problem. I do not have the evidence that she has a physical abnormality. Again, this could simply be chronic muscle spasm." *Id*. As accurately summarized by the ALJ, Dr. Lewis concluded that Newton had "chronic neck pain of unknown etiology." Tr. 19.

Not until December 2003 does the record reveal any objective basis for Newton's pain. An MRI dated December 9, 2003, about 20 months after Newton's last insured date, revealed a "large soft tissue disc protrusion C5-6 left, a new development from 2000," and an arachnoid cyst of the left T12-L1 foramen. Tr. 210. On December 21, 2003 V. James Makker, M.D., examined Newton and noted that "over the last six months [Newton] has developed increased severity of her neck pain and severe left-sided arm pain." Tr. 228-29. Surgery in January 2004 apparently resolved the left-side arm pain and a February 12, 2004 X-ray of the cervical spine

10 - FINDINGS AND RECOMMENDATION

revealed "unremarkable postoperative appearance. No sign of acute fracture or malalignment." Tr. 199. However, Newton continued to complain after the surgery of the same chronic neck and back pain that she had suffered prior to March 31, 2002.

The only objective medical evidence of a condition that could have caused Newton's pain prior to March 31, 2002, is the December 2003 MRI, but it relates back only for the six months (or back to June 2003) when she complained of increased pain and left-arm symptoms. The disc protrusion first diagnosed in December 2003 certainly qualifies as a severe impairment, but the record does not support the relation back of that impairment to March 31, 2002. Whatever increased pain was caused by the disc protrusion was resolved by surgery, leaving Newton with the same chronic pain she suffered prior to June 2003. Although the record establishes that Newton has suffered and sought treatment for chronic neck and back pain over the years, substantial evidence in the record supports the ALJ's conclusion that no objective basis can be found for Newton's limitations for a period longer than 12 months ending March 31, 2002.

As noted above, Newton has the burden of establishing a physical or mental impairment by medical evidence consisting of signs, symptoms, and laboratory findings, and not simply on the basis of her symptoms alone. 20 CFR § 404.1508. Dr. Lewis's conclusion in April 2003 that Newton has been disabled since January 2000 due to neck and back pain is not supported by medical evidence other than Newton's symptoms. This opinion is not even supported by Dr. Lewis's contemporaneous treatment notes. In March 2002 Newton reported that "her neck is doing better. She has been exercising more and going for massage therapy and it has helped quite a bit." Tr. 166. In June 2002 Newton was seen for a bump on her wrist and abdominal

11 - FINDINGS AND RECOMMENDATION

discomfort with no mention of neck and back pain. Tr. 163. There is no record of further medical treatment for neck or back pain until April 2003 when Newton was "very frustrated because it doesn't seem to get better and she is unable to work or do anything around the house because of the pain." Tr. 202. As Dr. Lewis noted at that time, "her last MRI of her neck did not reveal anything worrisome, so it is unclear what the cause of her pain is." *Id.* Although Dr. Lewis diagnosed "possible fibromyalgia" as of April 2003, she made no definitive diagnosis until May 2004 and then only as an answer on a form without any supporting evidence in the record in the form of notes, testing or referral.

Newton also contends that the ALJ erred by rejecting Dr. Lewis's opinion that Newton has "pain related extreme depression" on the basis that "she would not recommend psychological evaluation." Tr. 21. However, Dr. Lewis never diagnosed the cause of Newton's chronic pain as severe depression, chronic pain syndrome, somatization disorder, or any other potential mental impairment. Instead, Dr. Lewis treated the depression as a symptom, rather than as a cause, of the pain.

In sum, the ALJ gave clear and convincing reasons for rejecting the opinion of Newton's treating physician. Absent that medical opinion, the record supports the ALJ's conclusion that Newton did not suffer from a medically determinable severe impairment that significantly limited her ability to work as of January 1, 2000, her alleged onset date, through March 31, 2002, her date last insured.

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be affirmed.

## SCHEDULING ORDER

12 - FINDINGS AND RECOMMENDATION

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 23, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due 10 days after the date the objections are filed, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 6th day of June, 2006.

/s/ Janice M. Stewart_____
JANICE M. STEWART
United States Magistrate Judge

13 - FINDINGS AND RECOMMENDATION